The first case that we're hearing this morning is Audubon of Kansas v. Department of Interior 21-3209, and we'll hear from the appellant. Good morning, Your Honors. May it please the Court? This case is about agency accountability. The service surrendered the water supplies of the refuge. We sued to challenge that surrender, and now the service claims sovereign immunity. But the service can't have its ducks and eat them too. It can't rule through a Memorandum of Agreement, or MOA, and then escape accountability for that ruling. The law of agency action is pragmatic, it is functional, and a fundamental purpose of agency and administrative law is to prevent gamesmanship. Well, for final agency action, what is the decision that you contend is final? The 2020 Memorandum of Agreement. Just signing the agreement itself, or some portion of the agreement? I would say the entirety of the agreement, which was drafted and negotiated in 2019 and then signed in 2020. Even though there are contingencies within the agreement and future plans and so forth? In other words, it's not an agreement that says we're not going to ever assert our water rights. We yield to the irrigators upstream. It's a compromise, I guess, of sorts, that contemplates things will occur in the future. How is that final? It's final because the district court made a fundamental error in confusing finality with permanence. In the second whereas clause of the MOA, the service explicitly says that augmentation will be the primary mechanism to address the impairment of the refuge water right. There are four to five mutual covenants in this MOA. The covenant to augmentation. The covenant that GMD will build the augmentation well field. The covenant that the service will not call its water right. A covenant it renewed in January of this year. Well, let me press you on that a little bit. In January of 2022, it did not say that we will never in the duration of 2022 assert our water rights. It said it is present tense, our intent, as long as everything proceeds as anticipated, not to secure our water rights. But let's say that it did implicitly create an expectation that the department wouldn't secure its water rights in 2022. Well, obviously, that's about seven weeks away. On January 1, 2023, would at least the, whatever it was, temporary commitment not to ask for administration of water rights as a practical result be at least prudentially moved because there will be nothing to foreclose the department from asking for administration of water rights come January 1st. I think it's extraordinary that the service, which owns a senior water right, says on the 5th of January, four months before irrigation begins, that it won't call its water right. It might be extraordinary, but is it prudentially moved on December 31st at midnight? It is not prudentially moved because if anything requires an exception to the mootness doctrine, it would be this, which has been agreed in 2019, signed with the MOA in 2020, and renewed through 2022. So you would at least agree that it would ordinarily become moot on December 31st, but you're arguing that the capable repetition, yet evading review exception would be triggered. Let me clarify that, Your Honor. I think what I would say is the MOA has obligations and covenants much beyond the service's commitment not to call its water right. It is still in effect. It has not been terminated. And as of the January 5th letter, those commitments, including building the augmentation well field, now extend through 2028. So it's important to recognize that the MOA is very much in effect, and we should not isolate one aspect when you've got four to five covenants in this MOA. All right, putting aside the water rights, you've mentioned the second whereas clause. What about the third and fourth one? The third one, it is the intent of the parties to initiate evaluation of the proposal to develop an augmentation well field. Obviously, the third and fourth whereas clauses anticipate that there's going to be an environmental assessment, that there's going to be a number of other evaluative measures before there's a final determination of whether to rely solely on a well field augmentation. Well, we keep waiting for this magical messianic subsequent agreement to arrive, and we have yet to see it. We have no indication that it's arriving. And I want to emphasize that by turning the primary water supply of the refuge water right from surface water to groundwater, that envisions a permanent change in two of the most valuable attributes of the water right, its source of supply and its point of diversion. So the augmentation well field and the commitment to augmentation are the cornerstone upon which any subsequent agreement will depend. So, Counselor, could I just jump in here then? Tell me why your mootness argument is not inconsistent with your final agency action argument. In other words, for mootness, you're saying, oh, there's so much left to do. There are all these things that are left to do. But doesn't that count against you when you're trying to argue that there's a final agency action here? I don't believe it does because of the severity and the momentousness of this commitment to augmentation. If augmentation will be the means by which the services impairment complaint is resolved, and that is the first commitment in the MOA, then any subsequent agreement necessarily is predicated on that surrender of the surface waters of Rattlesnake Creek. So I don't believe this case is moot as of December 31st, because that commitment to augmentation will absolutely remain, and the refuge water right, which has always been a surface water right, will no longer be that. Thank you. Do you have an objection to a dual policy that the department would explore well field augmentation and continue to ask for administration of water rights? I do not have an objection. Let me explain our ideal way to deal with that. This basin is in a state that needs triage. We are losing 30,000 to 60,000 acre feet of groundwater base flow a year. In the short term, augmentation may be necessary as a blood transfusion, but over the long term, the clear standards of the System Improvement Act require biological integrity, and that includes hydrological integrity. So it may very well be the case, based on the hydrological conclusions of the analysis of this basin, that we need a combination of short-term augmentation and long-term rebalancing of the refuge and its hydrogeology. So as I understand it, you don't have an objection to the proposal to develop a well-filled augmentation. Your objection is to the commitment that you see to foreclose any short-term request to administer water rights. Your Honor, that question gets to the core of augmentation as a problem in Kansas. There is no water law on augmentation in the state of Kansas. This is not Colorado, which dedicated an entire 1969 act to augmentation. It exists one place in the Kansas Water Appropriation Act. So we have no idea what augmentation means. Under Kansas law, it's not even recognized as a beneficial use of water, which means it's not a legal use. So what we are very much opposed to, based on the clear mandates of the System Improvement Act, is that the hydrology of the basin be balanced according to historic conditions. And if augmentation short-circuits that, then we have a serious problem. We have a serious problem that is in clear contradiction to the clear mandates in the System Improvement Act. So I don't want to say we're okay with augmentation as a long-term resolution, because in our opinion, we brought this case once the service said, we're not going to protect our water right, and we're going to permanently relinquish two of its most important attributes. So the MOA has very important consequences. Between 2013 and 2019, the service followed the System Improvement Act. The service followed the CCP, the Comprehensive Conservation Plan. It requested an impairment investigation. And then once the state found that the water right was indeed badly impaired, it requested water. And that goes against your failure to act claim, doesn't it? Service is acting in the ways that you just described. The service pulled a dramatic 180-degree turn in 2019 and 2020. We can't argue that the service failed to act between 2013 and 2019, according to the CCP. It was requesting water. It was following the own conclusions of the impairment report. But then it absolutely goes rogue and says, we won't call our water. We won't worry about hydrological integrity. We will only focus on augmentation. So I don't think it goes against our 7061 claim due to the clear requirements of the System Improvement Act. The consequences of the MOA are enormous. It permanently changes the water right. And as I've said, it's the cornerstone agreement for any of these future subsequent agreements, upon which the government puts so much reliance on. The GMD-5 amicus brief is a lesson in Orwellian misuse of language. Even though the agreement says agree and agreed and there's the word agreement, it's not actually an agreement. But that can't possibly be the case when the parties have relied upon this joint commitment to augmentation. And at page 5 of the GMD-5 brief, it says, thanks to the agreement, we have obtained federal money through the NRCS to pursue augmentation viability. My final point is that this is major federal action affecting the environment. This is definitely something that's subject to need for review. Because of the irrevocability of the commitment of federal resources, you have, I'm sorry, the service has acknowledged the seriousness of these depletions. The state, in its impairment report, even stated that groundwater depletions exceed stream flow. That's chief engineer talk for they dried up the stream. And to permanently condone the dewatering of the basin through the short-circuit hydraulic solution of augmentation is major federal action. So if you accept that this MOA is not final agency action, which has been approved for two to three years and then renewed, you'll have given every federal agency an escape route to avoid agency accountability under the APA. And that's why you must reverse. Thank you. Thank you. We'll hear from the ability. Good morning, and may it please the court. Ariel Moran Jeffries on behalf of the United States Department of the Interior. This court should either affirm the district court's judgment or dismiss this appeal as moot. I plan to discuss first actions of 762 and then go on to inaction 761. I'll discuss mootness in turn with each. But before I do that, I want to take a step back and just discuss two quick points. I want to discuss why this has been such a complicated problem for the service. The first reason is that the service's water right is subject to the state's administrative process. So the Kansas Department of Agriculture, the Division of Water Resources, is the one that controls largely the pace and the outcome of this process. And the service's water right is subject to that process, and the service has to engage in it. But water rights are water rights. You're not contending that there's some question whether or not the water right is enforceable. If you call for the water right, you're going to get your water right, under any state's law, at least in the West, right? You have prior appropriation. The service called for its water right in 2017. The service called for its water right in 2018. The service has followed that process and has attempted to file these requests to secure water, and it hasn't received water. Now, the Kansas... Sorry, Your Honor. If I look puzzled, it's because sometimes there's not enough water for all of the appropriators. That's true. But are you saying that there was enough water, and yet Kansas still refused to provide it? The Kansas Division of Water Resources, under its regulations, under 541, is required to communicate with a groundwater management district if there is one. And so it went through that process. And so for the years after the impairment report was released in 2016, what we see is the Division of Water Resources asking the groundwater management district what it should do to resolve that impairment. They went back and forth for a number of years, and we tried to urge the process along, but there was ultimately no remedy that the groundwater management district came up with that was acceptable to the Division of Water Resources. And so that's how we get to 2020, and that's how we get to the services decision to sign this memorandum of agreement and start potentially exploring augmentation as a solution through the NEPA process. The second thing I would point out is sort of how we got to augmentation. The underlying water issue here is complicated. It is technical. Unfortunately, unlike in some situations, the Division of Water Resources can't just turn off the pumps. It won't lead to stream flow immediately getting to the refuge. We're talking on a scale of, according to the impairment report, at least two to three years and maybe decades, depending on how far the pumps are from the stream. And this is a 1,300-square-mile basin. Most pumping is happening miles away from the stream. Only 3% is within a mile of the stream. Only 8% is even within two miles of the stream. It's going to take a long time to get water if we just turn off the pumps. That's why augmentation in the Division of Water Resources impairment report is considered as a necessary part of any solution and why the service wants to explore it as a potential solution to the impairment. So with that background, I want to get into Section 706-2 and agency action. The first reason is that this Memorandum of Agreement is not the consummation of the agency's decision-making. Now, the APA sets up a process for agency consideration of an action, for the agency to take that action, and then for there to be judicial review of that action. And we're at the beginning of that process. We signed a Memorandum of Agreement to get us to the NEPA analysis, and that NEPA analysis is currently ongoing. If there's a final agency action that's taken at the end, then the court can review that. If the service does decide definitively to pursue augmentation, the court could review that, but we aren't there yet. We're in the middle of a decision-making process. How do you reconcile that with what your adversary referred to in the second where is clause? Because it does say that augmentation will be the primary mechanism in addressing the complaint. So there has been at least, depending on what you call the consummation of a process or the initiation of a process, a determination by the department that this will be the primary method of providing water. First of all, I want to clarify that the service has not concluded that augmentation will be the solution to the impairment, but I'll wrestle with that language with you for a second as well. I think three things. First of all, as Your Honor pointed out, I think it needs to be read in context of the third and the fourth clauses in that agreement, which says this is an initiation of a decision-making process. If you read that clause in context of the rest of the agreement, it says that augmentation will be the primary mechanism, and I think emphasis needs to be on primary. The next sentence of that clause, for example, says that there may need to be other potential solutions, for example, a water purchase program, a water movement program, the agreement to remove end guns. And so I think what that clause is getting at is that for the purposes of this agreement, for the purposes of initiating a NEPA process, you know, we're asking what is this NEPA process going to look at before the Groundwater Management District can go to NRCS and get a grant for the funding for the NEPA analysis. So we need to have a concrete vision of what we're doing a NEPA analysis on. Within that world, augmentation is the primary mechanism, but there may need to be other mechanisms. And of course, as, you know, you point out, the third and fourth clauses make it clear this is all subject to environmental review. This is all subject to a feasibility study. All of that is ongoing. And so I think that needs to be read in context of that. I guess the other point I would make is that augmentation, when you compare it to the other items in that clause, like a water rights purchase program or water rights movement program, augmentation is the one thing that the Groundwater Management District can itself do, right? The Groundwater Management District can get this funding to build the augmentation well field. So that's the only thing within its purview. The rest of it, it can try, but that's all contingent upon finding a willing seller of the water rights, et cetera, et cetera, or finding someone to remove their handgun. So I think read in the context, it's not a commitment to augmentation. The service certainly does not see it as a commitment to augmentation. The third point, if you'll bear with me, that I'd like to make, is just that even if this court reads it that way, I think that's ultimately sort of a pre-decisional argument, and parties will bring that at the end of a NEPA analysis if an agency hasn't fully considered all of its options and it came into the NEPA analysis already with an idea in mind, but that's an argument that needs to be raised once the NEPA analysis is complete. Parties can't come in under the APA before the final decision is made and challenge it on the basis of something like this. So when will there be consummation? When will there be a final agency decision ever? I think it really depends on what happens, and I'll try to play through potential scenarios with the caveat that I am speculating, depending on the results of this NEPA analysis. But I'll try to come up with potential avenues in the future. First, this is led by NRCS. I think that's important. So, of course, the defendant here, the Department of Interior and the Service, the Department of Agriculture and NRCS is the one that is giving, potentially, this two-part grant. So the NEPA analysis is being led by that agency and the services are participating entity. So one potential avenue is that the NEPA analysis is complete. Let's say it looks positive, right? Let's say the feasibility study comes back, and it looks like augmentation could deliver sufficient water quality, sufficient water quantity, and it's better than the alternatives. At that point, then the Groundwater Management District would have to go back to NRCS, get the second part of that grant for the funding. So there's a potential final agency action in that decision to give grant money on the part of NRCS. It's possible that the service would later make some sort of final agency action. I'm not sure exactly what that would look like. I think it really turns on what happens in this NEPA process. I would also remind the court that the service really isn't the final decision-maker here at the very end of the day. There are a number of steps that happen, but ultimately the State Division of Water Resources is the one that's going to determine whether or not augmentation or any other solution is going to address the impairment of the services complaint. So there may be a final State action also. I think that's probably the world of future possibilities. Unfortunately, I can't nail down specifically what will happen because the service hasn't made a final decision yet. Yet his argument is that because the development of a well-filled augmentation process is obviously, by design, going to take years, it's going to take an involved NEPA assessment, that the department unilaterally determined, notwithstanding the fact that it has senior water rights, elected to voluntarily forego even asking the Department of Water Resources to administer water rights as they requested in 2017 and 2018. In January, said the same thing. We're not going to do it, presumably in January of 2023. Presumably the department is going to do the same thing. And so for years, because this process is going to take so much time, that there is not enough water and the department is not even taking any steps to ask the state administrators to administer water rights. And so I don't understand, even though it's contingent on approval by the Department of Water Resources and the chief engineer, how you can say that it's not an infinal agency action for the years that this area is going to be without adequate water. Two points. First of all, this court has made clear in Utah Native Plant that this wait-and-see method, when an agency is considering its options, is not a final agency action. That when an agency is taking the time to, for example, go through a NEPA analysis, that consideration isn't a final agency action. And I take Your Honor's point about the request to secure water and not filing that specifically for 2020 and 2021. And I see your concern that it may be that the service makes a decision in the future not to file a request to secure water if an augmentation well field is built. I think we're getting into a speculative realm of possibilities. I think we need to wait for the NEPA analysis to be completed, which is on track to be completed.  I want to stress it's entirely possible that the service will decide that augmentation is not feasible, that it will not redress it. That's what this process is about, and the service needs to be able to have that time, a matter of two, three years, to sort out whether or not this will be a possible way of enforcing its water right. And so the way I really look at it is it's exchanging one mechanism of enforcing the water right for exploring a different mechanism of enforcing the water right. But that doesn't mean that the service has abandoned its water right. So the other point I would want to make is that with regard to the discrete decision not to file a request to secure water in 2020 and 2021, at that point, this is entirely moot. And, you know, we see Audubon pointing to the agreement as a whole because I think it has to for mootness and redressability purposes. If what we're looking at is just the agreement not to file a request to secure water for those two years, a decision is done and frankly there's just nothing that this court can do to redress the past decision not to file a request to secure water. The service still has full legal rights today to file a request to secure water if it decided to. That's a decision that the service frankly has to make every single day, a decision whether or not to file a request to secure water, and it's wholly within the purview of the service as the owner of that water right to make that discretionary enforcement decision. The second thing I would point to, if I may, with my last minute, is sort of the inaction argument. Ultimately, plaintiffs fail to identify any discrete legal duty to file a request to secure water. They point to three broad purpose statements, but all of those clearly fall under SUA's admonition that courts cannot compel compliance with broad statutory mandates that leave discretion in how to achieve the ends. Congress could have but did not decide to require statutorily the service to file a regular request to secure water. The service is exploring a means of enforcing its water right and it's not required to file a request to secure water by any statutory means. And I think this is relevant, of course, for the 706.1 point, but I also think, you know, getting back to your last question, Judge Bacharach, I think it's relevant for thinking about the 706.2 claim, too, because if the actual action we're looking at is not the memorandum of agreement, which I would stress, because of clauses three and four, clearly envisions the initiation of a process. If what we're looking at is just the agreement not to file a request to secure water, unless there's an affirmative obligation, even if this court said that those two years that that was unlawful, the service still would be in the same position of being able to file or not file a request to secure water. And so I think they come together. I see that my time has elapsed. I would ask the court, unless the court has any further questions, to either affirm or dismiss the appeal as moved. Thank you. Thank you. The appellant has some time for rebuttal. Thank you, Your Honor. I would just like to make three points. First of all, this argument that the service is at the mercy of the state water engineer is simply not a credible argument, because under the regs and under the statutes, if a senior water right holder calls for administration of water rights, the chief engineer shall enforce priorities, according to the Water Appropriation Act, 82A706, Kansas statutes. But that didn't happen in 2018 and 2019. And I would love to know why, Your Honor. That's why we sued the state as well, and we dismissed the state out of this federal lawsuit. But there has to be, I don't want to testify, that's not my job, but we would like to get to the bottom of why a nondiscretionary duty by the chief engineer was reversed by his agency superior, the Secretary of Agriculture. Kansas is the only state in the union where the chief water engineer is under the jurisdiction of the Department of Agriculture. Maybe there's a clerical requirement to secure the water rights, but the department is not representing the Department of Water Rights in Kansas. And so having tried and failed twice, isn't it not a terribly unreasonable path to say, okay, well, we don't know why they're doing it any more than the appellate does, and so we're going to try to go this other route. That's a baffling move because it would contradict, as Judge Phillips pointed out, exactly how the prior appropriation doctrine works, and as the agency itself acted between 2013 and 2019. Thank you very much. I stole some of your rebuttal time, so I'll give you another minute. Well, I'd love that. First of all, I want to emphasize on the 7062 claim, the whole point of final agency actions, that is definitive. Final is definitive. Non-final is contingent. What we have here is a definitive commitment to augmentation and to transforming the hydrology of the basin. And what we have here is kicking the can down the road yet again, which very much affirms my central point here. If you affirm this decision, you will be giving agencies a way to string together short-term agreements in series and forever evade judicial review. Thank you very much. Thank you, counsel. This matter will be submitted, very well presented by both sides.